**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MURAD WILLIAMS,

      Petitioner,                      Civil No. 2:07-CV-15376
                                       HONORABLE ARTHUR J. TARNOW
v.                                  UNITED STATES DISTRICT JUDGE

THOMAS BIRKETT,

      Respondent,

_____/

**OPINION AND ORDER ADOPTING IN PART AND MODIFYING IN PART THE
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND
UNCONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS**

      Murad Williams, ("petitioner"), has sought a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, filed both *pro se* and by attorneys Natasha Webster and Loren Khogali of the Federal Defenders' Office, petitioner challenges the revocation of his probation for his conviction for unarmed robbery, M.C.L.A. 750.530.

      After reviewing the petition for writ of habeas corpus, the respondent's answer, the petitioner's supplemental brief, the respondent's objections to Magistrate Judge R. Steven Whalen's Report and Recommendation ("R & R"), and after taking testimony at the evidentiary hearing and hearing oral arguments, the Court will adopt in part and modify in part the Magistrate Judge's recommendation and will unconditionally grant the petition for writ of habeas corpus, based on the egregious nature and number of the constitutional violations ranging from: no notice of charges, no notice of right to hearing, no hearing, no allowance of Petitioner's right to speak, absence of meaningful counsel and ineffective assistance of counsel.

# I. Background

On November 5, 2003, petitioner pleaded guilty to the charge of unarmed robbery before Judge Maggie Drake in the Wayne County Circuit Court. In providing a factual basis for the plea, petitioner informed the court that he "jumped out of a vehicle, walked up to a gentleman, punched him in the stomach, [and] took $10." (Tr. 11/5/03, p. 26). Petitioner was 18 years old at the time of his plea, and had not finished high school. (*Id.,* p. 28). Petitioner's mother told Judge Drake that petitioner suffered from ADHD (attention deficit hyperactive disorder) and had been placed in special education classes since the first grade. *(Id.,* 29-30).

On March 12, 2004, petitioner appeared for sentencing. Judge Margie Braxton presided at petitioner's sentencing. Petitioner's counsel at the sentencing, Ms. Zena White, informed the court that petitioner was a "special needs individual." (Tr. 3/12/04, pp. 4-5). Judge Braxton told petitioner "I can tell you to your face, I don't like your attitude." (*Id.,* p. 5). Nonetheless, the judge sentenced petitioner to probation under the Holmes Youthful Trainee Act (HYTA)[1], with the condition that he serve 90 to 120 days in a boot camp program. Petitioner's sentencing guidelines were scored at 0-11 months. *(Id.* at pp. 9-10). The judge warned petitioner's counsel: "If he quits or does not fulfill the requirements of Boot Camp then I am going to send him to prison. He is going anyway with that attitude." *(Id.* at p. 10).

---

[1] HYTA allows certain young offenders to plead guilty and complete probation or a youth training program, during which the entry of a judgment of conviction is held in abeyance. *See Does v. Munoz,* 507 F.3d 961, 965 (6th Cir. 2007)(citing M.C.L.A.762.11). If the offender successfully completes the program, the charges are dismissed and there is no conviction. (*Id.)* (Citing M.C.L.A. 762.14).

On May 3, 2004, petitioner was brought back to court based on an apparent

violation of the terms of the boot camp program.  The proceeding took place in front of

Judge Drake.  The transcript of the proceeding is captioned "Resentence."

A new attorney, Clifford Woodards, II, was appointed that morning to represent

petitioner at this hearing.  When Judge Drake asked why the boot camp returned

petitioner to the court, petitioner's new counsel stated:

> "He violated the terms, Your Honor.  For the record, Cliff Woodards for my
> client, Murad Williams.  He violated, what it says, phase one of the program.
> I think he had a little respect issue, talking back, those types of things. and
> my client informs me that he failed to pretty much listen to them." (Tr. 5/3/04,
> p. 3).

After defense counsel argued for mitigation of sentence *(Id.,* pp. 4-5), Judge Drake

questioned the Petitioner as follows:

> THE COURT: You were given boot camp and placed on HYTA.
> DEFENDANT: Yes, ma'am.
> THE COURT: And you refused to adhere to the terms and conditions of the
> HYTA probation and the boot camp, is that it?
> DEFENDANT: Yes, ma'am.
> THE COURT: What happened there, Mr. Williams?  Tell me what happened.
> What happened when you went to boot camp?
> DEFENDANT: Ma'am, I did everything they told me to do, but-
> THE COURT: But.
> DEFENDANT: Ma'am, but-
> THE COURT: I didn't hear you.
> DEFENDANT: I guess it was too hard for me, ma'am.
> THE COURT: How old are you?
> DEFENDANT: Ma'am, 18.
> THE COURT: What was too hard for you?
> DEFENDANT: (No response).
> THE COURT: What was too hard for you?
> DEFENDANT: Ma'am, all the cursing and yelling and stuff like that.
> THE COURT: Wait a minute, wait a minute, wait, wait. You struck someone
> in the stomach and took money from them, and you cursed at the time you
> did it. Do you remember that?

3

DEFENDANT: Yes, ma'am.
THE COURT: So what was so different at boot camp? You don't like-you can dish it out, but you can't take it, is that it?
DEFENDANT: Yes, ma'am.
THE COURT: It was too hard for you to do physical exercise. You know, you are a big, tall, strong man, but you can't do that.
DEFENDANT: No, ma'am. Ma'am, I did all the exercises, ma'am.
THE COURT: What didn't you do?
DEFENDANT: Ma'am, listen, ma'am.
THE COURT: You didn't listen, ma'am.
DEFENDANT: Yes, ma'am.
THE COURT: Do you have a hearing problem?
DEFENDANT: No, ma'am. *(Id.,* pp. 7-9).

Petitioner's family members and members of his church spoke on his behalf, offering counseling and employment if he were continued on probation. *(Id.,* pp. 9-17). The judge, however, rejected their pleas, stating that petitioner "failed to comply with the terms and conditions of probation," and that petitioner "violated his conditions of boot camp [and] was returned to this Court for sentence." Judge Drake imposed a sentence of 1 to 15 years. (*Id.,* p. 18).

Petitioner requested the appointment of appellate counsel on September 1, 2005. On November 28, 2005, petitioner's appellate counsel filed a motion for relief from judgment pursuant to M.C.R. 6.500, *et. seq.* A hearing was conducted on the post-conviction motion on January 23, 2006. At this hearing, Judge Drake mentioned, for the first time, that probation had been revoked because petitioner "got involved in threatening workers at the boot camp" or "got involved in some type of altercation at the boot camp." (Tr. 1/23/06, pp. 6, 8). The judge also explained that since petitioner had been given warnings at the original sentencing, he was not entitled to a subsequent probation violation hearing. (*Id.,* pp. 8-9). The trial court denied the motion. *People v.*

*Williams,* No. 03-11896 (Third Circuit Court, January 23, 2006). The Michigan appellate courts denied petitioner leave to appeal. *People v. Williams,* No. 268119 (Mich.Ct.App. August 2, 2006); *lv. den.* 477 Mich. 968; 724 N.W. 2d 468 (2006)(Kelly, J. would remand for resentencing). [2]

Petitioner subsequently filed a petition for writ of habeas corpus on the following grounds:

> I. PETITIONER'S MINIMUM DUE PROCESS RIGHTS WERE VIOLATED WHEN HE WAS BROUGHT BACK FROM BOOT CAMP AFTER AN ALLEGATION THAT HE VIOLATED THE CONDITIONS OF BOOT CAMP AND WAS RE-SENTENCED TO PRISON, WITHOUT BEING GIVEN WRITTEN NOTICE OF THE ALLEGATIONS, AND WITHOUT BEING INFORMED BY THE COURT OF HIS RIGHT TO A PROBATION VIOLATION HEARING, AND RIGHT TO CONFRONT AND CROSS-EXAMINE WITNESSES AGAINST HIM.
>
> II. PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED BECAUSE COUNSEL DID NOT INFORM DEFENDANT OF HIS RIGHT TO A VIOLATION HEARING AND RIGHT TO CONFRONT AND CROSS-EXAMINE WITNESSES.

Respondent filed a motion to dismiss the petition on the ground that the application for writ of habeas corpus was barred by the statute of limitations found in 28

---

[2] While petitioner's first post-conviction motion was pending in the state courts, petitioner filed a second motion for relief from judgment in the state courts. The trial court rejected the motion and returned it to petitioner, because petitioner had already filed a previous motion for relief from judgment and was precluded under M.C.R. 6.502(G) from filing a second or successive motion for relief from judgment. *People v. Williams,* No. 03-11896 (Third Circuit Court, September 29, 2006). On October 26, 2007, the Michigan Court of Appeals likewise dismissed petitioner's appeal pursuant to M.C.R. 6.502(G)(1). *People v. Williams,* No. 280735 (Mich.Ct.App. October 26, 2007). Petitioner did not file an application for leave to appeal to the Michigan Supreme Court.

U.S.C. § 2244(d)(1). Respondent did not address the merits of the petition in the motion to dismiss, nor did respondent contend in his initial motion to dismiss that any of petitioner's claims were procedurally defaulted. On August 28, 2008, this Court denied the motion to dismiss, finding that the petition had been timely filed. The Court also ordered respondent to file an answer to the petition. On September 29, 2008, respondent filed an answer to the petition. On December 30, 2008, this Court referred this case to Magistrate Judge R. Steven Whalen for a report and recommendation.

On August 25, 2009, Magistrate Judge Whalen issued a Report and Recommendation (R & R) that the petition for writ of habeas corpus should be granted. *See Williams v. Birkett*, No. 2009 WL 2923058 (E.D. Mich. August 25, 2009). After the respondent filed objections to the R & R, this Court adopted in part the report and recommendation and ordered an evidentiary hearing. The Court also appointed counsel to represent petitioner. *Williams v. Birkett,* No. 2009 WL 2923053 (E.D. Mich. September 10, 2009).

An evidentiary hearing was conducted before this Court on February 2, 2010. Petitioner testified that on the day of the probation revocation hearing, counsel met with him for about "fifteen seconds" in the bullpen or lock-up area behind the courtroom. Although petitioner knew that he had been brought back to court for violating boot camp rules, petitioner testified that he was never advised of the charges against him. Petitioner indicated that counsel never showed him any legal documents or papers, nor did counsel advise him of his right to a probation revocation hearing. Petitioner testified that he did not know that he had a right to a probation revocation hearing. Petitioner

6

stated that he would have requested a probation revocation hearing had he known that he had this right. Petitioner claimed that he believed he was simply being brought back to court to be sent to prison.

Clifford Woodards, II, petitioner's counsel at the probation revocation hearing, also testified. Counsel admitted that his only contact with petitioner in this case was either in the bullpen, where other defendants were present, or in the courtroom, where counsel and his client were placed in an arraignment box, again with other defendants present. [3] Counsel estimated that he spent anywhere between fifteen seconds and five minutes speaking with petitioner. Counsel admitted that his conversations with petitioner took place in a "non-private" setting. Counsel claimed that he reviewed the documents with petitioner, stating that it was his standard practice to do so. Woodards, however, could not recall the specifics of the case. Woodards acknowledged that he was "royalty for a day", *i.e.*, he had been appointed by Judge Drake to represent all of the probation violators in her courtroom that day.

Woodards admitted that he was unaware of petitioner's special educational needs and cognitive problems. Although Woodards was present when the trial court berated petitioner, Woodards did not make any objection. Counsel had done no investigation nor preparation of the case before meeting petitioner. Upon further questioning, Woodards indicated that at the time of petitioner's probation revocation hearing, he had represented about 200 probation violators in the Wayne County Circuit

---

[3] Judge Drake's courtroom was an arraignment courtroom, which had a small set of seats for defendants to sit in while awaiting their turn.

Court, with approximately one third of those cases in Judge Drake's courtroom.

Counsel was assigned as appointed counsel to the courtroom by Judge Drake.   In

response to a question about whether he had ever demanded a probation revocation

hearing in front of Judge Drake, Mr. Woodards conceded that he did not want to

"irritate" Judge Drake, since she had assigned him to the cases in her courtroom.

Counsel testified that he received seventy five dollars for each defendant who was

being charged with violating his or her probation, no matter how much work he did on

the case.

At the conclusion of the hearing, the Court took the matter under advisement, but

released petitioner on unsecured bond, subject to the conditions outlined in the Court's

bond order.

## II.  Standard of Review

28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect
to any claim that was adjudicated on the merits in State court proceedings
unless the adjudication of the claim–

(1)     resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly
established Federal law, as determined by the Supreme
Court of the United States; or

(2)     resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the

state court arrives at a conclusion opposite to that reached by the Supreme Court on a

question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *(Id.* at 409). A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *(Id.* at 410-11).

### III. Discussion

The Court will discuss petitioner's claims together, because they are interrelated. In his first claim, petitioner contends that his due process rights were violated when his probation was revoked and he was sentenced to prison without being given written notice of the charges against him and without being advised by the court of his right to a probation violation hearing and his right to confront and cross-examine the witnesses against him at such a hearing. In his second claim, petitioner claims that he was deprived of the right to the effective assistance of counsel at the probation revocation hearing.

Respondent claims that petitioner's first claim is procedurally defaulted because he failed to object to the trial court's failure to advise him of his right to a probation revocation hearing at the time of the hearing. Respondent contends that petitioner's ineffective assistance of counsel claim is without merit and cannot serve as cause to excuse the default of the first claim.

Respondent did not raise these defenses in the motion to dismiss that he initially filed with the Court, choosing instead to argue that petitioner's habeas application was barred by the statute of limitations. By failing to address the merits of petitioner's claims in his initial motion to dismiss, respondent has waived any substantive defenses to the merits of the claims, as well as any procedural defense that the claim or claims are procedurally defaulted. *See Dickens v. Jones,* 203 F. Supp. 2d 354, 361 (E.D. Mich. 2002)(state waived affirmative defenses that habeas petitioner's federal habeas claims were noncognizable and waived because of petitioner's alleged misrepresentation and failure to object, where state failed to assert affirmative defenses in its initial answer to the habeas petition); *See also Henderson v. Palmer,* U.S.C.A. No. 07-1822 (6th Cir. August 10, 2007)(denying respondent's motion to stay the conditional writ of habeas corpus, where respondent failed to raise most of the arguments in the district court that he sought to raise on appeal); *Miller v. Stovall,* 641 F. Supp. 2d 657, 665 (E.D. Mich. 2009)(State, by failing to argue harmless error defense in its response to federal habeas corpus petition, waived issue); *Ward v. Wolfenbarger,* 323 F. Supp. 2d 818, 828 (E.D. Mich. 2004); *modified on other grds,* 340 F. Supp. 2d 773 (E.D. Mich. 2004)(state waived any substantive defenses to merits of habeas claim by failing to address merits in answer to petition). [4] Of course,

---

[4] An answer to a habeas petition is not like an answer to a civil complaint. It should respond to the allegations of the habeas petition. *Gardner v. Romanowski*, No. 2009 WL 1506721, *1 (E.D. Mich. May 27, 2009)(*citing Ukawabutu v. Morton*, 997 F. Supp. 605, 608-09 (D.N.J. 1998); *Chavez v. Morgan*, 932 F. Supp. 1152, 1153 (E.D. Wis. 1996)). An answer to a habeas petition should respond in an appropriate manner to the factual allegations contained in the petition and should set forth legal arguments

petitioner is not entitled to a default judgment on the ground that respondent has waived this issue, because a default judgment is unavailable in a habeas corpus proceeding under 28 U.S.C. § 2254 on the ground that state officials failed to respond to the petition. *Allen v. Perini*, 424 F. 2d 134, 138 (6th Cir. 1970); *Whitfield v. Martin,* 157 F. Supp. 2d 758, 761 (E.D. Mich. 2001)(same). Therefore, the Court must determine whether petitioner has stated a valid claim upon which habeas relief can be granted

In recommending that this Court grant habeas, Magistrate Judge Whalen made the following conclusions:

> At the May 3, 2004 hearing, Petitioner's counsel was representing an 18-year-old individual with a learning disability, who had been a special education student since the first grade. Counsel had been told at the original sentencing that if Petitioner failed to comply with the requirements of probation, he was going to be sent to prison, no questions asked. Yet, counsel proceeded with a resentencing [probation violation] without a written notice of the allegations, without assuring that Petitioner was made aware that he had a right to a hearing, without eliciting a knowing and voluntary waiver of that right from the Petitioner, without ensuring that there was clear evidentiary support for the alleged violation, and without obtaining a written statement by the factfinder as to the evidence relied on and reasons for revoking probation. Indeed, it does not appear from this record that counsel even knew that Petitioner had these rights.
> *See Williams v. Birkett,* Report and Recommendation, No. 2009 WL 2923058, at * 5.

---

in support of respondent's position, both the reasons why the petition should be dismissed and the reasons why the petition should be denied on the merits. *Gardner,* Slip. Op. at * 1; *Ukawabutu,* 997 F. Supp. at 609. "The practice of filing these 'piecemeal' motions is inconsistent with the Rules Governing Section 2254 Cases in the United States District Courts, with 28 U.S.C. § 2254(b)(2), which gives district courts the discretion to consider and deny unexhausted claims on their merits, and with fundamental principles of efficient case management." *Gardner,* Slip. Op. at * 1 (*citing Ukawabutu,* at 607).

Magistrate Judge Whalen further found that there was no statement from the state court record that petitioner knowingly or voluntarily waived his due process rights to a probation violation hearing, or that he or his attorney even knew that he had those rights. *(Id.,* at * 5). Magistrate Judge Whalen noted: "Counsel, in fact, proceeded as though the violation were *a fait accompli,*[5] and simply proceeded with sentencing arguments." *(Id.).*

Finally, Magistrate Judge Whalen remarked:

> Of further concern is the fact that there was no written notice of the precise violation charges, as required by *Gagnon.* While counsel and the judge apparently assumed that Petitioner had violated some condition of the boot camp, it is unclear precisely what, if anything, the Petitioner did that resulted in the boot camp sending him back to court. Petitioner's counsel alluded to some vague "respect" issue. The Petitioner's statements at the hearing, in response to Judge Drake's questioning, were even more ambiguous. While he said that boot camp was "too hard" for him, and that he did not like the cursing and yelling, he otherwise affirmed that he followed all of the rules and performed all of the physical exercises demanded of him. He told the judge, "Ma'am, I did everything they told me to do," and when the judge berated him for essentially being too lazy or stubborn to do the physical exercises, he said, "No, ma'am. Ma'am, I did all the exercises, ma'am."
> *Id.* at * 6.

This Court is in complete agreement with Magistrate Judge Whalen's findings of fact and conclusions of law. The Court, however, is even more disturbed by the testimony that was elicited at the evidentiary hearing concerning petitioner's ineffective assistance of counsel claim. Petitioner testified counsel met with him for about "fifteen seconds" in the bullpen or lock-up area behind the courtroom. Petitioner indicated that

---

[5] "This is French for 'a done deal.'" (footnote original).

12

counsel never showed him any legal documents or papers, nor did counsel advise him of his right to a probation revocation hearing. Petitioner testified that he did not know that he had a right to a probation revocation hearing.

Petitioner's counsel admitted that his only contact with petitioner in this case was on the day of the hearing, either in the bullpen, where other defendants were present, or in the courtroom, where counsel and his client were placed in the arraignment box, again with other persons present. Counsel estimated that he spent between fifteen seconds and five minutes speaking with petitioner and that these conversations took place in a "non-private" setting. Although counsel claimed that he reviewed the documents with petitioner, counsel could not recall the specifics of the case. Counsel admitted that he was unaware of petitioner's special educational needs and learning disability. Counsel did not make any objection or offer any argument when the trial court berated petitioner. Even more disconcerting was the fact that counsel had been appointed by Judge Drake to represent all of the probation violators in her courtroom that day. At the time of petitioner's probation revocation hearing, counsel had represented about 200 probation violators in the Wayne County Circuit Court, with approximately one third of those cases in Judge Drake's courtroom. In response to a question about whether he had ever demanded a probation revocation hearing in front of Judge Drake, Mr. Woodards indicated that he did not want to "irritate" Judge Drake.

In *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), the Supreme Court held that a probationer who faces revocation of probation is entitled to the same due process

guarantees that are afforded an alleged parole violator under *Morrissey v. Brewer*, 408 U.S. 471 (1972). These "minimum requirements of due process" are: (a) written notice of the claimed violations of probation, (b) disclosure to the probationer of the evidence against him, (c) an opportunity to be heard in person and to present witnesses and documentary evidence, (d) the right to confront and cross-examine adverse witnesses unless there is good cause to disallow confrontation, (e) a neutral and detached hearing body and (f) a written statement by the factfinder as to the evidence relied on and reasons for revoking probation. (*Id.* at p. 786).

A criminal defendant has a right to be represented by counsel at a hearing where his probation is revoked and sentence is imposed. *See Mempa v. Rhay*, 389 U.S. 128, 137 (1967).

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must normally satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *(Id.).* In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *(Id.).*

The Supreme Court has recognized that in certain Sixth Amendment contexts, prejudice is presumed. *Strickland,* 466 U.S. at 692. The "actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance." *(Id.).*

Where defense counsel entirely fails to subject the prosecution's case to "meaningful adversarial testing," there has been a constructive denial of counsel, and a defendant need not make a showing of prejudice to establish ineffective assistance of counsel. *Moss v. Hofbauer,* 286 F. 3d 851, 860 (6th Cir. 2002)(*quoting United States v. Cronic,* 466 U.S. 648, 659 (1984)).

This Court concludes that petitioner was constructively denied the assistance of counsel at his probation violation hearing. The Court bases it conclusion primarily on the fact that counsel did not meet with petitioner until the date of the hearing, for only a few minutes, at best, in the "bull pen," forcing counsel to discuss petitioner's case in a crowded and noisy room, with no privacy. *See United States v. Morris,* 470 F. 3d 596 (6th Cir. 2006).

ABA Standards provide:

Defense counsel should seek to establish a relationship of trust and confidence with the accused and should discuss the objectives of the representation and whether defense counsel will continue to represent the accused if there is an appeal. Defense counsel should explain the necessity of full disclosure of all facts known to the client for an effective defense, and defense counsel should explain the extent to which counsel's obligation of confidentiality makes privileged the accused's disclosures.

To ensure the privacy essential for confidential communication between defense counsel and client, adequate facilities should be available for private discussions between counsel and accused.

15

1 ABA Standard for Criminal Justice 1(a) & (b).

The *Eleven Principles of a Public Defense Delivery System,* which were adopted

by the Michigan Public Defense Taskforce in 2002 (2007 WLNR 26880282), and by the

State Bar of Michigan's Representative Assembly in 2002, contain eleven principles

that the state courts should follow regarding the representation of indigent criminal

defendants (Principles attached).  The relevant principles here, Numbers 1, 4 and 5

state:

> 1.      The public defense function, *including selection*...is independent.
>
> 4.  Defense counsel is provided sufficient time and a confidential space
> with which to meet with the client.
> 5.  Defense counsel's workload is controlled to permit the rendering of
> quality representation.

In *Mitchell v. Mason,* 325 F. 3d 732, 741 (6th Cir. 2003), the Sixth Circuit held

that there had been a complete denial of counsel where the defendant's attorney spent

approximately six minutes in the course of three separate meetings with the defendant

in the "bull pen" prior to the start of trial.

Likewise, in *Hunt v. Mitchell*, 261 F.3d 575, 583 (6th Cir. 2001), the Sixth Circuit

ruled that there was a total absence of counsel where an attorney was appointed only

minutes before trial and had no opportunity to consult with his client or prepare a

defense.

Finally, in *United States v. Morris, supra,* at 601-02, the Sixth Circuit ruled that a

defendant facing state charges of firearms and drug possession was constructively

denied the right to counsel, when counsel was assigned shortly before defendant

attended the hearing at which he was offered a choice of a plea bargain or the transfer

of his case to federal prosecution with a potential of a higher sentence.  In so ruling,

the Sixth Circuit noted that counsel did not meet with defendant until the day of the

hearing, when they conversed for a few minutes in the "bull pen" and counsel was

forced to review his client's options in a crowded and noisy room with no privacy. *(Id.).*

The Sixth Circuit also took note of the fact the fee system for court-appointed counsel,

whereby counsel was paid a $ 40.00 fee for appearing at the pre-preliminary hearing,

but received no additional fee if they requested a continuance for additional

preparation, provided "counsel an incentive to encourage the defendant to accept the

state's plea offer immediately, and a disincentive to seek more time to investigate and

seriously weigh the merits of a defendant's case." (*Id.,* at 601, n. 4).

In this case, the Wayne County Circuit Court's practice of assigning counsel

shortly before the probation violation hearing amounts to a "state impediment to

effective assistance of counsel." *Morris,* 470 F. 3d at 601.  In making this

determination, the Court notes "the extremely short time period that the system allows

appointed counsel to prepare for the hearing, [and] the lack of privacy afforded in the

bull pen, which prohibits counsel from having a confidential, privileged conversation

with the client before the hearing." *(Id.).*        Buttressing this Court's conclusion is

the fact that counsel admitted that he was unaware of petitioner's special educational

needs and cognitive problems, which could have served as a defense to the probation

violation charge, or in the alternative, could have been used as a mitigation factor at

sentencing.  Counsel, in fact, did not appear to know the precise nature of the

17

probation violation charges against petitioner. Counsel never raised any defense to the probation violation charge, nor did he make any objection or offer any argument when the trial court berated petitioner. Finally, counsel did not offer petitioner's special educational needs and cognitive problems in order to mitigate the sentence imposed. Counsel did not even request an updated pre-sentence investigation report. [6]

Finally, what is most disturbing to this Court is that the constructive denial of counsel here appears to be part of a larger continued pattern by the Wayne County Circuit Court of the denial of counsel at the institutional level. *Morris,* 470 F. 3d at 601, n. 4. At the time of petitioner's probation revocation hearing, counsel had represented about 200 probation violators in the Wayne County Circuit Court, with approximately one third of those cases before Judge Drake, who was the judge responsible for appointing counsel to those cases. In response to a question about whether he had ever demanded a probation revocation hearing in front of Judge Drake, Mr. Woodards admitted that he did not want to "irritate" Judge Drake, presumably because he did not want to lose a lucrative source of court appointments. This structure, whereby counsel must represent a client in front of the very judge to whom he is beholden for his court appointed assignments, "clearly provides counsel an incentive to encourage the defendant" to plead guilty to the probation violation immediately, "and a disincentive to

---

[6] An updated pre-sentence investigation report is required where a defendant is sentenced to prison after his probation is revoked. *See People v. Blount,* 130 Mich.App. 804, 805; 345 N.W.2d 203 (1983).

seek more time to investigate and seriously weigh the merits of a defendant's case".
*Morris,* 470 F. 3d at 601, n. 4. [7]

In addition, this lack of independence of counsel violates the first principle of the standards.

Finally, this Court agrees with Magistrate Judge Whalen that it was "troubling that the trial judge predetermined the outcome of the proceedings in favor of revocation, without recognizing that Petitioner had a right to a hearing, and without regard to any mitigating circumstances or any showing that the safety of the community could be assured while at the same time providing the Petitioner a successful opportunity for rehabilitation." *See Williams v. Birkett,* Report and Recommendation, No. 2009 WL 2923058, at * 9. Judge Drake's comments and conduct violated petitioner's right to "a neutral and detached hearing body" at his probation revocation hearing, *Gagnon,* 411 U.S. at 786.

It is instructive to compare what should be done prior to any probation violation hearing and sentencing and what was done by Mr. Woodwards on behalf of Mr. Williams. The list of what should be done is not all inclusive. What was done compared to what should be done:

---

[7] The term "lucrative" is used collectively, as each probation violation assignment pays $ 75.00. While this amount is more generous than the $ 40.00 fee paid in *Morris,* it is still too little to encourage or compensate for vigorous representation or even barely adequate representation.

| Should Be Done | Was Done |
|---|---|
| 1. Establish attorney-client relationship. | 1. Meet client. |
| 2. Review charges and police report with client. | 2. Stand next to client. |
| 3. Look at presentence report, preferably new one. | 3. Argue for mitigation. |
| 4. Review school records to determine if mitigating factors. | 4. Facilitate court's sentencing client. |
| 5. Review witnesses' statements. | |
| 6. Other preparation necessary to adequately advise client. | |
| 7. Seek alternatives to incarceration. | |

In addition to the constructive denial of counsel, which requires no showing of prejudice, Petitioner has also established actual prejudice. All of the defeciencies set forth above meant that Petitioner was denied a meaningful hearing with adequate notice of the charges; he was denied the right to present evidence in mitigation. See *Morris,* at 632-3.

The remaining question for the Court is what the appropriate habeas remedy would be in this case. A federal habeas court has broad discretion in conditioning a judgment granting habeas relief. *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987). 28 U.S.C. § 2243 authorizes federal courts to dispose of habeas corpus matters "as law and justice require. See, *Means, Federal Habeas Manual*, §13:11, pp. 1029-1034 (2009 Ed.).

An absolute or unconditional writ should issue where the nature of the error is incurable. *See Gentry v. Deuth,* 456 F. 3d 687, 692 (6th Cir. 2006). Petitioner was sentenced to one to fifteen years in prison on May 3, 2004. Petitioner spent almost six years in prison for an offense which involved the taking of $ 10.00 and for which the sentencing guidelines called for a minimum sentence of 0-11 months. As a result of being deprived the effective assistance of counsel at his probation revocation hearing in 2004, petitioner spent almost six years in prison which he should not have served. There is no way that ordering a new probation revocation hearing will cure this prejudice. Nor can petitioner adequately defend himself against the probation violation charges after this lengthy passage of time.

"[T]here is no absolute requirement that the [federal district] court delay issuance of a final writ until after the state has been afforded a specific period of time in which to re-try the petitioner." *Ward v. Wolfenbarger*, 340 F. Supp. 2d 773, 775-76 (E.D.Mich. 2004)(*quoting Latzer v. Abrams,* 615 F. Supp. 1226, 1227 (E.D.N.Y. 1985)). Although the normal remedy for a due process violation in a state criminal proceeding is not a discharge, "discharge is warranted where attempting an alternate remedy would not vitiate the prejudice of the fundamental unfairness or would itself violate a petitioner's constitutional rights." *Burkett v. Cunningham,* 826 F. 2d 1208, 1222 (3rd Cir. 1987).

In certain circumstances, an inordinate delay or deprivation of access to the appellate process renders the appeal worthless such that a petition for habeas corpus may be unconditionally granted. *See Turner v. Bagley*, 401 F. 3d 718, 727 (6th Cir.

2005)(unconditional writ granted based on the failure of petitioner's state court-appointed appellate attorneys and the Ohio State Court of Appeals to adjudicate his direct appeal for more than eight years following his conviction); *Ward,* 340 F. Supp. 2d at 776(unconditional writ granted where petitioner denied right to appeal and thirty three years had elapsed from his conviction); *Hannon v. Maschner,* 981 F. 2d 1142, 1144-45 (10th Cir. 1992)(unconditional writ issued where petitioner lost the opportunity to file an appeal and thirty three years had elapsed from conviction); *Burkett,* 826 F. 2d at 1226(discharge was appropriate remedy for speedy trial and due process violations resulting from state's failure to sentence defendant for five and one-half years following conviction).

In light of the passage of time in this case, this Court concludes that justice would be better served by issuing an unconditional writ of habeas corpus. Merely granting petitioner a new probation revocation hearing will not vitiate the prejudice arising from the deprivation of his constitutional right to a probation revocation hearing and the effective assistance of counsel at that hearing nearly six years after he was originally charged with violating the terms of his probation. *Ward,* 340 F. Supp. 2d at 776.

An unconditional release is also warranted in this case, because the significant passage of time severely prejudices petitioner's ability to present a defense to his probation violation charge. *See e.g. Morales v. Portuondo,* 165 F. Supp. 2d 601, 609-11 (S.D.N.Y. 2001).

Moreover, in light of the fact that the state sentencing guidelines in this case were 0-11 months, petitioner has served a far greater sentence than he would have received had he been afforded the effective assistance of counsel at his probation revocation hearing in 2004. *See e.g. United States ex. rel. Schuster v. Vincent,* 524 F. 2d 153, 154-62 (2nd Cir. 1975)(petitioner entitled to immediate release when he had been confined to state hospital for thirty one years without an opportunity for a sanity hearing and had been in prison for a total of forty four years for a crime for which the average prison term was fifteen years).

The state courts' handling of petitioner's case, together with the evidence brought forth at the evidentiary hearing, clearly and convincingly demonstrates that petitioner's probation revocation hearing "was wrought with constitutional violations so egregious, resulting in consequences so grave, and incarceration so lengthy," that petitioner is entitled to immediate and unconditional release. *See Hays v. Farwell,* 482 F. Supp. 2d 1180, 1186 (D. Nev. 2007). The "gross violations of petitioner's due process rights were so egregious that his unconditional release from custody is required." *Ouimette v. Moran,* 762 F. Supp. 468, 480 (D.R.I. 1991); *aff'd* 942 F. 2d 1 (1rst Cir. 1991).

## III. ORDER

**Based on the foregoing, the Court:**

**(1) DENIES Respondent's Objections.**

**(2) ADOPTS in part and MODIFIES IN PART in part the reasoning of the Report and Recommendation,**

**(3) ADOPTS the recommendation of the Report and Recommendation as modified; and**

**(4) UNCONDITIONALLY GRANTS the Petition for Writ of Habeas Corpus because petitioner was deprived of his due process rights at his probation violation hearing, as well as the right to the effective assistance of counsel at that hearing. Petitioner is ordered discharged from custody.**

S/Arthur J. Tarnow
Arthur J. Tarnow
United States District Judge

Dated: February 26, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 26, 2010, by electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Secretary

## THE ELEVEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM - February 2002

1. **[1] The public defense function, including the selection, funding, and payment of defense counsel [2] , is independent.** The public defense function should be independent from political influence and subject to judicial supervision only in the same manner and to the same extent as retained counsel [3]. To safeguard independence and to promote efficiency and quality of services, an independent board composed of attorneys and non-attorneys should oversee defender, assigned counsel, or contract systems [4]. Removing oversight from the judiciary ensures judicial independence from undue political pressures and is an important means of furthering the independence of public defense [5]. Where there is a defender office, the selection of the chief defender and staff should be made on the basis of merit, and recruitment of attorneys should involve special efforts aimed at achieving diversity in attorney staff [6]. Since the responsibility to provide defense services rests with the state, there should be state funding and a statewide structure responsible for ensuring uniform quality statewide [7].

2. **Where the caseload is sufficiently high [8], the public defense delivery system consists of both a defender office [9] and the active participation of the private bar.**
Historically, Michigan's private bar participation has included part time defenders, assigned counsel plan, or contracts for services [10]. However, a "mixed system" of a defender office and an appointed counsel system provides the most effective and stable system over time. The defender office can provide a base for training programs, motion banks, investigators, and other support services. Substantial involvement of the private bar increases independence, provides support for and information about the system outside the defender office, and is a relief valve for conflicts and overload in the system. The appointment process of the attorneys should never be ad hoc [11], but should be according to a coordinated plan directed by a administrator who is also an attorney familiar with the varied requirements of practice in the jurisdiction [12].

3. **Clients are screened for eligibility [13], and defense counsel is assigned and notified of appointment, as soon as feasible after clients' arrest, detention, or request for counsel.** Counsel should be furnished and counsel notified of the appointment, usually within 24 hours of [14] the arrest, detention or request [15].

4. **Defense counsel is provided sufficient time and a confidential space with which to meet with the client.** Counsel should interview the client as soon as practicable before the preliminary examination or the trial date [16]. Counsel should have confidential access to the client for the full exchange of legal, procedural and factual information between counsel and client [17]. To ensure confidential communications, private meeting space should be available in jails, prisons, courthouses and other places where defendants must confer with counsel [18].

5. **Defense counsel's workload is controlled to permit the rendering of quality representation.** Counsel's workload, including appointed and other work, should never be so large as to interfere with the rendering of quality representation or lead to the breach of ethical obligations, and counsel is obligated to decline appointments above such levels [19]. In the absence of local standards, national caseload standards should not be exceeded [20], but the concept of workload (i.e., caseload adjusted by factors such as case complexity, support services, and an attorney's nonrepresentational duties) is a more accurate measurement [21].

6. **Defense counsel's ability, training, and experience match the complexity of the case.** Counsel should never be assigned a case that counsel lacks the experience or

training to handle competently, and counsel is obligated to refuse appointment if unable to provide ethical, high quality representation [22] .

7. **The same attorney continuously represents the client until completion of the case.** Often referred to as "vertical representation," the same attorney should continuously represent the client from initial assignment through the trial and sentencing [23]. The attorney assigned for the direct appeal should represent the client throughout the direct appeal. Except for emergencies, substitute or stand-in counsel should not be used as a routine method to handle additional cases. The client and the court are entitled to have the approved attorney prepare and handle the case.

8. **There is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system.** Public defense should participate as an equal partner in improving the justice system [24]. There should be parity of workload, salaries and other resources between prosecution and defense in criminal cases in which the accused has been provided counsel at public expense [25]. Assigned counsel should be paid a reasonable fee, taking overhead into consideration, and should be reimbursed for expenses [26]. Where they exist, contracts with private attorneys for public defense services must never be let primarily on the basis of cost; and should specify performance requirements and the anticipated workload, and provide for contingencies such as excess cases, high profile or complex cases [27], and funding for expert and investigative services [28].

9. **Defense counsel is provided with and required to attend continuing legal education.** Counsel and staff providing defense services should have systematic and comprehensive training appropriate to their areas of practice and at least equal to that received by prosecutors [29].

10. **Defense counsel is supervised and systematically reviewed for quality and efficiency according to nationally and locally adopted standards.** The defender office (both professional and support staff), assigned counsel, or contract defenders should be supervised and periodically evaluated for competence and efficiency [30].

11. **When there is a defender office, one function of the office will be to explore and advocate for programs that improve the system and reduce recidivism.** The defense attorney is in a unique place to assist clients, communities and the system by becoming involved in the design, implementation and review of local programs suited to both repairing the harm and restoring the defendant to a productive, crime free life in society.

Click here for report.

---

1   The Representative Assembly of the State Bar of Michigan adopted the bold letters of the "Eleven Principles" (i.e., not including commentary) on April 27, 2002.

2   "Counsel" as used herein includes a defender office, a criminal defense attorney in a defender office, a contract attorney in private practice accepting appointments. "Defense" as used herein relates to both the juvenile and adult public defense systems.

3   National Advisory Commission on Criminal Justice Standards and Goals, Task Force on Courts, Chapter 13, *The Defense* (1973) [hereinafter "NAC"], Standards 13.8, 13.9: National Study Commission on Defense Services, *Guidelines for Legal Defense Systems in the United States* (1976) [hereinafter "NSC"], Guidelines 2.8, 2.18, 5.13: American Bar Association Standards for Criminal Justice, *Providing Defense Services* (3rd ed. 1992) [hereinafter "ABA"], Standards 5-1.3, 5-1.6, 5-4.1: *Standards for the Administration of Assigned Counsel Systems* (NLADA 1989) [hereinafter "Assigned Counsel"], Standard 2.2: NLADA *Guidelines for Negotiating and Awarding Contracts for Criminal Defense Services*, (1984) [hereinafter "Contracting"], Guidelines II-1, 2: National Conference of Commissioners on Uniform State Laws, *Model Public Defender Act* (1970) [hereinafter "Model Act"], § 10(d): Institute for Judicial Administration/American Bar Association, *Juvenile Justice Standards Relating to Counsel for Private Parties* (1979) [hereinafter "ABA Counsel for Private Parties"], Standard 2.1 (D).

4   Each board should be consistent with national standards. NSC, *supra* note 2, Guidelines 2.10-2.13: ABA, *supra* note 2, Standard 5-1.3 (b): Assigned Counsel, *supra* note 2, Standards 3.2.1, 2: Contracting, *supra* note 2, Guidelines II-1, II-3, IV-2: Institute for Judicial Administration/ American Bar Association, *Juvenile Justice Standards Relating to Monitoring* (1979) [hereinafter "ABA Monitoring"], Standard 3.2.

5   Judicial independence is "the most essential character of a free society" (American Bar Association Standing Committee on Judicial Independence, 1997).

6   ABA, *supra* note 2, Standard 5-4.1

7   NSC, *supra* note 2, Guideline 2.4: Model Act, *supra* note 2, § 10: ABA, *supra* note 2, Standard 5-1.2(c): *Gideon v. Wainwright*, 372 U.S. 335 (1963) (provision of indigent defense services is obligation of state).

8   "Sufficiently high" is described in detail in NAC Standard 13.5 and ABA Standard 5-1.2. The phrase can generally be understood to mean that there are enough assigned cases to support a full-time public defender (taking into account distances, caseload diversity, etc.), and the remaining number of cases are enough to support meaningful involvement of the private bar.

9   NAC, *supra* note 2, Standard 13.5; ABA, *supra* note 2, Standard 5-1.2: ABA Counsel for Private Parties, *supra* note 2, Standard 2.2. "Defender office" means a full-time public defender office and includes a private nonprofit organization operating in the same manner as a full-time public defender office under a contract with a jurisdiction.

10  ABA, *supra* note 2, Standard 5-1.2(a) and (b); NSC, *supra* note 2, Guideline 2.3; ABA, *supra* note 2, Standard 5-2.1.

11  NSC, *supra* note 2, Guideline 2.3; ABA, *supra* note 2, Standard 5-2.1.

12  ABA, *supra* note 2, Standard 5-2.1 and commentary: Assigned Counsel, *supra* note 2, Standard 3.3.1 and commentary n.5 (duties of Assigned Counsel Administrator such as supervision of attorney work cannot ethically be performed by a non-attorney, citing ABA Model Code of Professional Responsibility and Model Rules of Professional Conduct).

13  For screening approaches, see NSC, *supra* note 2, Guideline 1.6 and ABA, *supra* note 2, Standard 5-7.3.

14  NSC, *supra* note 2, Guideline 1.3.

15  NAC, *supra* note 2, Standard 13.3; ABA, *supra* note 2, Standard 5-6.1; Model Act, *supra* note 2, § 3; NSC, *supra* note 2, Guidelines 1.2-1.4; ABA Counsel for Private Parties, *supra* note 2, Standard 2.4 (A).

16  NSC, *supra* note 2, Guideline 1.3.

17  American Bar Association Standards for Criminal Justice, *Defense Function* (3rd ed. 1993) [hereinafter "ABA Defense Function"], Standard 4-3.2: *Performance Guidelines for Criminal Defense Representation* (NLADA 1995) [hereinafter "Performance Guidelines"], Guidelines 2.1-4.1: ABA Counsel for Private Parties, *supra* note 2, Standard 4.2.

18  ABA Defense Function, *supra* note 15, Standard 4-3.1.

19  NSC, *supra* note 2, Guideline 5.10; ABA Defense Function, *supra* note 15, Standards 4-2.3, 4-3.1, 4-3.2; Performance Guidelines, *supra* note 15, Guideline 2.2.

20  Numerical caseload limits are specified in NAC Standard 13.12 (maximum cases per year: 150 felonies, 400 misdemeanors, 200 juvenile, 200 mental health, or 25 appeals), and other national standards state that caseloads should "reflect" (NSC Guideline 5.1) or "under no circumstances exceed" (Contracting Guideline III-6) these numerical limits. The workload demands of capital cases are unique: the duty to investigate, prepare and try both the guilt/innocence and mitigation phases today requires an average of almost 1,900 hours, and over 1,200 hours even where a case is resolved by guilty plea. *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* (Judicial Conference of the United States, 1998). *See also ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (1989) [hereinafter "Death Penalty"].

21  ABA, *supra* note 2, Standard 5-5.3; NSC, *supra* note 2, Guideline 5.1: *Standards and Evaluation Design for Appellate Defender Offices* (NLADA 1980) [hereinafter "Appellate"], Standard 1-F.

22  Performance Guidelines, *supra* note 11, Guidelines 1.2, 1.3(a): Death Penalty, *supra* note 15, Guideline 5.1.

23  NSC, *supra* note 2, Guidelines 5.11, 5.12; ABA, *supra* note 2, Standard 5-6.2: NAC, *supra* note 2, Standard 13.1; Assigned Counsel, *supra* note 2, Standard 2.6: Contracting, *supra* note 2, Guidelines III-12, III-23: ABA Counsel for Private Parties, *supra* note 2, Standard 2.4 (B) (i).

24  ABA Defense Function, *supra* note 15, Standard 4-1.2(d).

25  Support services include benefits, technology, facilities, legal research, support staff, paralegals, investigators, and access to forensic services and expert witnesses. NSC, *supra* note 2, Guideline 3.4; ABA, *supra* note 2, Standards 5-4.1, 5-4.3: Contracting, *supra* note 2, Guideline III-10: Assigned Counsel, *supra* note 2, Standard 4.71: Appellate, supra note 20 (Performance): ABA Counsel for Private Parties, *supra* note 2, Standard 2.1 (B) (iv). *See* NSC, *supra* note 2, Guideline 4.1 (includes numerical staffing ratios, e.g., there must be one supervisor for every 10 attorneys, or one part-time supervisor for every 5 attorneys: there must be one investigator for every three attorneys, and at least one investigator in every defender office). *Cf.* NAC, supra note 2, Standards 13.7, 13.11 (chief defender salary should be at parity with chief judge; staff attorneys at parity with private bar.)

26  ABA, *supra* note 2, Standard 5-2.4: Assigned Counsel, *supra* note 2, Standard 4.7.3.

27  NSC, *supra* note 2, Guideline 2.6: ABA, *supra* note 2, Standards 5-3.1, 5-3.2, 5-3.3: Contracting, *supra* note 2, Guidelines III-6, III-12, and *passim*.

28  ABA, *supra* note 2, Standard 5-3.3(b)(x): Contracting, *supra* note 2, Guidelines III-8, III-9.

29  NAC, *supra* note 2, Standards 13.15, 13.16: NSC, *supra* note 2, Guidelines 2.4(4), 5.6-5.8: ABA, *supra* note 2, Standards 5-1.5: Model Act, *supra* note 2, § 10(e): Contracting, *supra* note 2, Guideline III-17: Assigned Counsel, *supra* note 2, Standards 4.2, 4.3.1, 4.3.2, 4.4.1: *NLADA Defender Training and Development Standards* (1997): ABA Counsel for Private Parties, *supra* note 2, Standard 2.1 (A).

30  NSC, *supra* note 2, Guidelines 5.4, 5.5: Contracting, *supra* note 2, Guidelines III-16: Assigned Counsel, *supra* note 2, Standard 4.4: ABA Counsel for Private Parties, *supra* note 2, Standards 2.1 (A), 2.2: ABA Monitoring, *supra* note 3, Standards 3.2, 3.3. Examples of performance standards applicable in conducting these reviews include NLADA Performance Guidelines, ABA Defense Function, and NLADA/ABA Death Penalty.